**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES** | **CRIMINAL ACTION** |
| **v.** | |
| **JOHN DOUGLAS BURCH** | **NO.  24-23** |

**MEMORANDUM**

**HODGE, J.**                                                  **January 29, 2026**

Before the Court is Defendant John Burch's ("Defendant") Motion for a *Franks v. Delaware* Hearing (ECF No. 57), Motion to Suppress Evidence (ECF No. 59), Motion to Dismiss the Indictment (ECF No. 60), Defendant's additional memorandum in support of his motions (ECF No. 64), and the Government's responses in opposition (ECF Nos. 63, 66). The Court finds that Defendant has not met the standard required for a *Franks* Hearing and that the remaining Motions can be determined without oral argument. For the reasons that follow, the Court denies Defendant's motions.

On January 18, 2024, a federal grand jury returned a four-count indictment ("Indictment") charging Defendant with violations of 18 U.S.C. §§ 2422(b) and 2423(b). Count One alleges the Defendant caused a minor female, who was between the ages of 14 and 17 ("Minor 1"), to produce and transmit sexually explicit videos and images depicting Minor 1. Count Two alleges Defendant directed Minor 1 to engage in commercial sex acts with various men in Pennsylvania and caused Minor 1 to create visual depictions of the sex acts to transmit to Defendant as proof that she engaged in the conduct. Counts Three and Four charge Defendant with traveling from California

to Pennsylvania in 2014 and 2015, respectively, and sexually assaulting Minor 1 at a hotel in West Conshohocken, Pennsylvania.

## I.    FACTUAL BACKGROUND[1]

### A.    Search Warrant

The affidavit supporting the Government's January 22, 2024 application for a warrant to search Defendant's home, 11683 Texas Avenue, Unit 302, Los Angeles, CA, for child pornography was given by Special Agent Jennifer Zenszer ("Agent Zenszer") of the Federal Bureau of Investigation ("FBI"). (Exhibit A to ECF No. 63, filed at 24-mj-287, ECF No. 5 ("Exhibit A").) Agent Zenszer has been with the FBI for approximately twenty years, and she has conducted numerous investigations involving the sexual exploitation of children. (*Id.* at 14.) She has training and experience in the investigation of computer-related crimes, which includes how computers have revolutionized the way in which child sexual abuse materials ("CSAM")[2] are produced, distributed, and utilized. (*Id.* at 19–20.) Based on Agent Zenszer's experience and training, she attested that the majority of individuals who collect and produce CSAM are persons who have a sexual attraction to children. (*Id.* at 23–24.) Moreover, the majority of individuals who collect and produce CSAM may maintain writings in hard copy or digital medium on the subject of sexual activities with children as a way of understanding their own feelings, justifying those feelings, and finding comfort in their illicit behavior and desires, and such materials are rarely destroyed by the individuals. (*Id.* at 24–25.) Additionally, individuals who collect and produce

---

[1] The Court adopts the pagination supplied by the CM/ECF docketing system.

[2] While the statutes charged in the Indictment use the term "child pornography," the Court adopts the term CSAM in its stead, as it better reflects the abuse depicted in the images and videos. *See, e.g.*, U.S. Department of Justice, *Child Sexual Abuse Materials*, at 1, available at https://www.justice.gov/d9/2023-06/child_sexual_abuse_material_2.pdf.

CSAM rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect their collection of illicit materials. (*Id.* at 25–26.)

In December 2022, Minor 1 filed a police report with the West Conshohocken Police Department regarding the abuse she endured by Defendant between 2014 and 2017. (*Id.* at 27.) She was interviewed by detectives and reported being raped by Defendant at a hotel in West Conshohocken in 2014 and 2015, when she was fourteen- and fifteen-years-old. (*Id.* at 28.) She reported that she had not previously contacted law enforcement about the abuse. (*Id.*)

In March 2023, Agent Zenszer interviewed Minor 1 at the FBI Fort Washington Office. (*Id.* at 27.) Minor 1 reported that she met Defendant through the online chat forum "Omegle" in 2014. (*Id.* at 28.) They transitioned communication to the KIK online messaging platform. (*Id.* at 29–30.) Based on records Minor 1 obtained from KIK, Defendant's screenname on the platform at the time of their first encounter on KIK on August 19, 2024, was "mstr_trainer_yq5." (*Id.* at 30.) She reported that Defendant coerced her to send him sexually explicit videos and later coerced her to go to places like the King of Prussia Mall, where she would meet men and engage in sex acts per Defendant's instructions. (*Id.* at 29, 36.) Minor 1 recalled dozens of encounters with men over a three-year period. (*Id.* at 29) She reported that the abuse ended in 2017 when she went to college and ceased contact with Defendant. (*Id.*) Minor 1 also reported that Defendant bragged to her about his collection of CSAM, which he forced her to watch. (*Id.* at 33.)

Minor 1 provided her old laptop to the FBI, which was imaged and contained downloaded chats, sexually explicit videos and photos, and other data that corroborated her accounts of abuse. (*Id.* at 29.) Minor 1 also reported Person 1, who law enforcement investigated and arrested in Utah

in June 2023.[3] (*Id.* at 27.) Materials obtained from Minor 1's old laptop also corroborated her accounts of abuse by Person 1 with videos of Minor 1 and Person 1 engaging in sex acts. (*Id.* at 42–43.) Minor 1 informed law enforcement that she transmitted these images involving her and Person 1 to Defendant as proof that she was complying with his demands to engage in sex acts with other men. (*Id.* at 44.)

Agent Zenszer and other law enforcement officers have conducted interviews, proffers, and physical surveillance; served subpoenas; collected documents and records; served warrants for devices, physical locations, email accounts, and electronic servers; and conducted forensic analysis of computers, email, and cloud-based accounts. (*Id.* at 27.) Records collected confirmed Defendant's travel arrangements from California to Pennsylvania in 2014 and 2015, and established that he was in the Philadelphia area in November 2014 and November 2015 when Minor 1 reported that he sexually assaulted her. (*Id.* at 49.) Based on Agent Zenszer's training and experience, she affirmed that it was unlikely Defendant would destroy the CSAM material involving Minor 1 because he had a sexual interest in her and encouraged the production of the CSAM. (*Id.* at 44–45.)

Additionally, law enforcement issued a subpoena to KIK, which identified the username mstr_trainer as registered on July 18, 2014, and opened with an email address belonging to Defendant. (ECF No. 63-1; ECF No. 63 at 14 (noting that neither party contests that this email address belongs to Defendant).) Next to the email address listed in the subpoena is "(unconfirmed)." (ECF No. 63-1.) The Government also asserts that law enforcement issued a

---

[3] A federal grand jury returned a two-count indictment charging Person 1 with manufacturing CSAM in violation of 18 U.S.C. § 2251(a). (*Id.* at 45–46.)

subpoena to Apple Inc. and received records detailing Defendant's use of Apple products, which use the same email address as used to open the KIK account. (ECF No. 63.)

Agent Zenszer stated that the following facts support probable cause for issuance of the search warrant at the target location: (1) Defendant's continued use of the same cellphone number he used from 2014 to 2017 when he communicated with Minor 1; (2) photograph identification by Minor 1 of the Defendant from a photograph he sent to Minor 1 several years ago compared with a recent photograph posted by Defendant's girlfriend taken outside of the target location; (3) physical surveillance by FBI agents confirming Defendant resided at the target location; and (4) documents collected from Defendant's banking institution further support that Defendant lived at the target location since January 2015. (Exhibit A at 47–48.)

Following the Indictment and issuance of the search warrant by a U.S. Magistrate Judge in the Central District of California, Defendant was arrested in his home on January 23, 2024. (ECF No. 63 at 6.) At the time of his arrest, federal agents executed the search warrant, and seized electronic evidence from his home, including Defendant's Apple iPhone. (*Id.*)

**B.    Grand Jury**

In May 2023, Minor 1 and Agent Zenszer testified before a grand jury. (ECF No. 63 at 14.) The 2023 grand jury was not presented with any indictment to consider, and the term of that grand jury expired before the issuance of the Indictment in January 2024. (*Id.*) A new grand jury was convened in January 2024. (*Id.*) Minor 1 and Agent Zenszer's sworn testimony before the 2023 grand jury was read into the record in January 2024, with the Government counsel reading the questions posed to the witnesses and Agent Zenszer re-reading her earlier testimony and the testimony of Minor 1. (*Id.* at 15.) Prior to reading the earlier testimony to the grand jury, the Assistant U.S. Attorney stated: "I'd like to now go to [Minor 1]'s grand jury testimony. We're

going to read selected portions of that. That also occurred on Thursday, May 25, 2023, before the grand jury. We'll start on page 2. I will be myself, and [Agent Zenszer] will portray [Minor 1]." (Exhibit B to ECF No. 63 at 59 ("Exhibit B").) At the conclusion of the readback, the Assistant U.S. Attorney stated, "That concludes the readback testimony from [Minor 1]." (*Id.* at 59–60.) After the readback, Agent Zenszer provided additional testimony. After that concluded, the Assistant U.S. Attorney asked if any members of the grand jury had questions. (*Id.* at 80–81.) The grand jury only asked one question: which inquired about why there was not an additional charge against Defendant. (*Id.*)

## II.    LEGAL STANDARD

### A.    *Franks* Hearing

A defendant is entitled to an evidentiary hearing upon a substantial preliminary showing that an affiant made material omissions or false statements with reckless disregard for the truth, and that the remaining truthful statements, standing alone, do not establish probable cause. *United States v. Desu*, 23 F.4th 224, 234 (3d Cir. 2022). A defendant cannot "rest on mere conclusory allegations," but must "present an offer or proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses." *Id.* (quoting *United States v. Yusuf*, 461 F.3d 374, 383 n.8 (3d Cir. 2006)).

A "reckless disregard for the truth" can be found where an officer recklessly omits facts that any reasonable person would want to know, and where assertions are made when the officer has obvious reasons to doubt the truth of what they are asserting. *Desu*, 23 F.4th at 234. To determine if omissions or false statements were material, a court must remove the alleged misrepresentation or correct an omission, and then determine if the affidavit still contains probable cause to support the warrant. *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997).

### B.    Motion to Suppress

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const. Amend. IV. The defendant bears the burden of proof initially to suppress evidence. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). Once the defendant establishes a basis for the motion, the burden shifts to the government to show by a preponderance of the evidence that the search or seizure was reasonable. *Id.*; *see United States v. Lowe*, 791 F.3d 424, 432 n.4 (3d Cir. 2015). The exclusionary rule precludes evidence at trial that was either directly obtained from a search or seizure in violation of the Constitution, or indirectly flowing from unlawful search or seizure under the fruit of the poisonous tree doctrine. *Herring v. United States*, 555 U.S. 135, 139 (2009); *United States v. Smith*, 575 F. Supp. 3d 542, 550 (E.D. Pa. 2021).

### C.    Motion to Dismiss Indictment

Rule 12(b)(3)(A)(v) allows a defendant to move to dismiss an indictment for an error in the grand-jury proceeding. Fed. R. Crim. P. 12(b)(3)(A)(v). A defendant seeking dismissal of an indictment must show that errors in the grand jury proceeding caused actual prejudice to the defendant. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988). Dismissal of an indictment is an "extreme sanction," reserved only for the most egregious abuses of the criminal process. *United States v. Fisher*, 692 F. Supp. 495, 501 (E.D. Pa. 1988).

## III.    DISCUSSION

### A.    Motion for *Franks* Hearing

Defendant asserts that Agent Zenszer's affidavit in support of the search warrant omitted the unconfirmed status of Defendant's email used for the KIK account with reckless disregard for the truth. Additionally, Defendant argues that substantial space dedicated to graphic crimes of "Person 1" creates a misleading impression of a joint criminal enterprise. He contends that were

the unconfirmed status of the email included in the affidavit and the discussion of "Person 1"

omitted, there would be no probable cause. In response, the Government asserts that the affidavit's

references to the KIK account stem from information the FBI received directly from Minor 1 and

not from the records received from KIK, and even if information regarding the email address were

included, there would still be probable cause. The Government responds that Person 1 is referenced

to corroborate Minor 1's allegations of abuse and the existence of CSAM depicting her that was

transmitted to Defendant. Further, the Government argues that the affidavit does not allege or

suggest any criminal association between Person 1 and Defendant.

Regarding the KIK account discussion in the affidavit, Defendant is incorrect on multiple

grounds in asserting that "[i]n Paragraph 24, the Affiant states that an administrative subpoena

served to KIK revealed that the Defendant's email address was associated with the account

'mstr_trainer' with a registration date of July 18, 2014." (ECF No. 57 ¶ 4.) First, Paragraph 24 of

the affidavit makes no mention of KIK. Paragraph 14, rather, states that "[b]ased on records Minor

1 obtained from KIK, Minor 1's screenname first engaged with BURCH's screenname,

'mstr_trainer_yq5' on August 19, 2014." (Exhibit A at 30.) There is no mention of the

administrative subpoena, Defendant's email address, or the registration date of July 18, 2014 in

the affidavit. Rather, probable cause was supported by information provided from Minor 1,

including her testimony and materials she obtained from KIK. Thus, there is no material omission

here.

Even if there were a material omission, inclusion of the information obtained from the

administrative subpoena to supplement information from Minor 1 would not destroy probable

cause. *See Sherwood*, 113 F.3d at 400 (instructing courts faced with a putative omission to supply

the omitted information to the original affidavit and determine if the affidavit fails to contain

probable cause). The Government's brief provides a revised Paragraph 14 as follows, with the addition of information from the KIK subpoena in bold:

> Minor 1 stated that at the outset of their communications, BURCH proclaimed that it was his right, as a man, to have sexual relationships and encounters with as many women as he wanted. She said that BURCH spoke to Minor 1 about his relationships and encounters with other women as well as other minors. According to Minor 1, BURCH and Minor 1 eventually transitioned their communication medium to the KIK online messaging platform. Based on records Minor 1 obtained from KIK, Minor 1's screenname first engaged with BURCH's screenname, "mstr_trainer_yq5" on August 19, 2014. Minor 1 was 14 years old at the time. Once their communication through the KIK platform began, BURCH sent Minor 1 a photograph of himself. Minor 1 described BURCH as being a consultant for Crossfit gyms across the country. [**In March 2023, the FBI served an administrative subpoena on KIK for the most recent subscriber data associated with the KIK account mstr_trainer_yq5. KIK responded on March 24, 2023, and provided records that detailed the account was created on July 18, 2014, using the email address: john@thebizraiseyourgame.com. KIK's records provided that that email address was "unconfirmed." According to KIK, users are required to provide an email address when registering an account but there is no requirement for it to be valid or verifiable; whatever email a user provides, KIK will send a confirmation email to that account, but the user is not required to confirm it to use the KIK application. Based upon the foregoing, while john@thebizraiseyourgame.com was the email address associated with mstr_trainer_yq5, KIK did not receive confirmation that that email address was valid.**]

(ECF No. 63 at 40.) Additionally, the Government noted that if the KIK subpoena information were added, the affidavit would also include information from the Apple Inc. subpoena connecting Defendant to the same email address. (*Id.* at 41.)

Rather than detract from probable cause, the additional bold text *adds* a potential connection between the KIK account and Defendant. Probable cause exists where, under the totality of circumstances, "there is a fair probability that contraband or evidence of a crime will be found in [the] particular place" to be searched. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The addition of the email address increases the probability that Defendant, despite never having verified the email address, is connected to the KIK account. The addition of the information from

the KIK subpoena would still support probable cause along with the other evidence supporting the connection between Defendant and the KIK account.

As for the discussions of Person 1, Defendant's argument falls far below meeting the burden to obtain a *Franks* hearing. Defendant argues that the affidavit creates a misleading impression that he engaged with Person 1 in a joint criminal enterprise, the descriptions of Person 1's "graphic crimes" (ECF No. 57 at 2) prejudiced the Magistrate Judge, and no nexus was established between the acts related to Person 1 and Defendant. None of these arguments involve omissions or assertions that could be considered false statements. The affidavit contains no statement of a joint criminal enterprise; therefore, there is no statement that could have been made with reckless disregard for the truth when Agent Zenszer had reason to doubt the truth of the assertion. *See Desu*, 23 F.4th at 234. The affidavit further establishes a nexus between Person 1 and Defendant: it provides that Defendant directed Minor 1 to engage in sex acts with other men, including Person 1, and directed her to send him video evidence that she complied with his orders. (Exhibit A at 27.) This increases the relevance of its inclusion. Minor 1 informed the FBI that she transmitted the images described involving Person 1 to Defendant. (*Id.* at 44.) Defendant has not proffered any evidence of a false statement in that testimony of Minor 1. Because Defendant has not identified a false statement related to Person 1, let alone presented an offer of proof contradicting the affidavit, he has not met his burden for a *Franks* hearing.

### B.    Motion to Suppress Physical Evidence

Defendant raises three arguments as to why the physical evidence obtained as a result of the January 2024 search should be excluded under the Fourth Amendment: (1) the search warrant lacked a sufficient nexus between the alleged criminal activity and the residence searched; (2) the information used by the Government was stale; and (3) the warrant was constitutionally overbroad

without a temporal limit. The Government responds that the warrant was of proper scope and was supported by sufficient probable cause that established a proper nexus between the apartment and the evidence of criminal activity to be seized based on information that remained relevant.

The affidavit supported that Defendant resided at the target location since 2015, had the same cellphone number he had from 2014 to 2017, and that he bragged about his CSAM collection and received CSAM of Minor 1. The search warrant provided multiple connections between the physical location and the evidence of the crime. As noted above, the search warrant did not, as Defendant suggests, rely solely on an email address associated with a KIK account registered in 2014—that email address is not mentioned in the search warrant. Rather, the search warrant relies on testimony and documentation provided by Minor 1 supporting the allegations of crimes Defendant is charged with committing. Agent Zenszer further affirmed from her experience and training that collectors and producers of CSAM are unlikely to destroy their collections, and this expectation was greater for Defendant because he directed the creation of CSAM involving Minor 1 and had a sexual interest in her. Additionally, the search warrant established that Defendant continued to use the same cellphone number that he used when communicating with Minor 1 from 2014 to 2017.

In issuing a search warrant, "[a] court 'is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense.'" *United States v. Hodge*, 246 F.3d 301, 305–06 (3d Cir. 2001) (quoting *United States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000)). Direct evidence linking the place to be searched to the crime is not required for the issuance of the search warrant. *Id.* at 305. "[A] magistrate judge may infer probable cause from 'the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide . . . [evidence].'" *United*

*States v. Stearn*, 597 F.3d 540, 558 (3d Cir. 2010) (quoting *United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993)). The Third Circuit has recognized that collectors of CSAM tend to hoard their collections for long periods of time. *United States v. Vosburgh*, 602 F.3d 512, 528 (3d Cir. 2010). Given the evidence from Minor 1 and the confirmation that Defendant continued to live at the same residence he lived in since 2015, coupled with the nature of the items sought, probable cause can be inferred.

Whether the information was stale follows a similar analysis. The Government does not dispute that the 2024 search warrant relies on information from 2014 to 2017.[4] But age alone is not dispositive of staleness, and determining staleness is not an exercise of mechanically counting days. *Vosburgh*, 602 F.3d at 528. Instead, a court must consider the nature of the crime and type of evidence. *Id.*

The nature of the crime here involves continuous abuse of a minor, which generated CSAM, over the course of multiple years. This is distinct from *Zimmerman*, which Defendant points to, because while that case involved sexual abuse of minors, the search warrant affidavit only contained assertions related to adult pornography and there was no evidence that Zimmerman possessed CSAM. *United States v. Zimmerman*, 277 F.3d 426, 430, 434 (3d Cir. 2002). CSAM "is illegal and difficult to obtain" and thus it is presumed that "individuals will protect and retain child pornography for long periods of time." *Id*. The type of evidence is digital, as it is alleged that Minor 1 transmitted CSAM to Defendant. (Exhibit A at 27.) It is possible that the CSAM collection

---

[4] The time gap between the crimes and the search warrant occurred because Minor 1 did not come forward until December 2022, after she became an adult, sought years of therapy, and ultimately determined that she should report what occurred to law enforcement. (Exhibit A at 29.) Child sex offenses are not subject to a statute of limitations, *see* 18 U.S.C. § 3299, which acknowledges that there is often a delay in time between the time the abuse occurred and the time it is reported.

Defendant allegedly bragged about to Minor 1 was not exclusively digital. The nature of digital evidence weighs against a finding of staleness. *United States v. Payne*, 394 F. App'x 891, 894 (3d Cir. 2010).

Defendant argues that the Government improperly invoked a presumption that he is a CSAM "collector" to skirt staleness. Specifically, he argues that he "is charged with Enticement and Travel which are contact offenses, not possession offenses." (ECF No. 64 at 5.) But the Third Circuit is clear that a defendant need not be formally accused of violating a CSAM possession statute or have direct evidence that a defendant kept CSAM in the home. *See United States v. Caesar*, 2 F.4th 160, 174 (3d Cir. 2021). The fact that Defendant was charged with enticing a minor to manufacture CSAM (Count I of the Indictment) does not suggest there is no connection between the crimes alleged and collection of CSAM. Moreover, this interpretation ignores allegations that that Minor 1 transmitted CSAM to Defendant as proof she was complying with his demands, in connection with Count II of the Indictment. (Exhibit A at 44.) The search warrant further provides that Minor 1 reported that Defendant bragged about his CSAM collection and made her watch CSAM, further establishing the likelihood that Defendant possessed CSAM in connection with and as a result of the crimes with which he is charged. (*Id.* at 33.)

The Government points to numerous Third Circuit cases and beyond that have found information to not be stale where a period of five years or less between the offense conduct related to CSAM and search warrant's execution passed because of the nature of the crime. (ECF No. 63 at 28.) Many of the cases cited address a gap in time of less than one year. However, there is no bright line time limit that evidence or digital traces of CSAM vanish after five years.

*United States v. Carroll* presents comparable facts to this case. 750 F.3d 700 (7th Cir. 2014). In that case, the Seventh Circuit found that a five-year gap in time between the offense

conduct and search warrant did not render the information stale. The victim in that case reported she had been photographed and sexually assaulted as a child by her babysitter. *Id.* at 703. In addition to general recognition of the well-established hoarding habits of collectors of CSAM, the court found that because Carroll sexually abused the victim and produced the CSAM, those images were irreplaceable to him. *Id.* at 705. As such, the court determined it was fair to infer he would retain the images on some type of digital media "for a very long time." *Id.*

Here, the search warrant asserts that Defendant had ongoing communication with Minor 1 over multiple years. It is alleged that he traveled from California to Pennsylvania twice to sexually assault her. Minor 1 informed law enforcement that Defendant bragged about his CSAM collection. Moreover, it is alleged that Defendant orchestrated and directed Minor 1 to engage in sex acts with other men, and she sent him videos and images of those sex acts as proof that she followed his orders. Based on this evidence, it is fair for the Magistrate Judge to infer that such images were irreplaceable to Defendant, and that he would still retain them notwithstanding the extended passage of time.

Lastly, Defendant argues that the search warrant is a prohibited general warrant because it permitted the Government to rummage through digital files created in 2023 and 2024. To determine whether a warrant is overbroad, the court "must compare the scope of the search and seizure authorized by the warrant with the ambit of probable cause established by the supporting affidavit." *In re Impounded Case (Law Firm)*, 840 F.2d 196, 200 (3d Cir. 1988).

The search warrant authorized search and seizure of evidence of violations of 18 U.S.C. §§ 2422(b), 2423(b), 2251(a), (e), 2252(a), and 1591(a). (Exhibit A at 4.) The search warrant further specified eleven categories of items subject to search and seizure for violations of these statutes, such as "[a]ll visual depictions of minors engaged in sexually explicit conduct . . . ," and

"[a]ll documents, to include in electronic form . . . pertaining to the production, possession, receipt, access to, or distribution of child pornography . . . ." (*Id.* at 5–6.) The search warrant then lists items that may be seized and provides a search procedure for digital devices, which requires a determination that the device contains data falling within the scope of other items to be seized. (*Id.* at 11.)

This is not a general warrant authorizing exploratory rummaging in a person's belongings without probable cause. *See United States v. Christine*, 687 F.2d 749, 752–53 (3d Cir. 1983). Searches of digital media require, by necessity, the examination of a great number of files to locate particular files. *See United States v. Morgan*, 562 F. App'x 123, 127 (3d Cir. 2014). The absence of a temporal limit "does not make the warrant 'so facially deficient' 'as to render official belief in its [legality] entirely unreasonable.'" *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents ($92,422.57)*, 307 F.3d 137, 151 (3d Cir. 2002) (quoting *Hodge*, 246 F.3d at 306). The scope of the search and seizure is defined by the identified statutes for which law enforcement sought evidence of violations. The procedures for searching digital devices provide protocol for identifying specific items to be seized that are evidence of violations of the identified statutes. *See, e.g.*, *United States v. Stabile*, 633 F.3d 219, 233 (3d Cir. 2011) (upholding a search and seizure for evidence of financial crimes across all of defendant's computer hard drives because the evidence could be found in any location on any of the hard drives, and very likely would have been disguised or concealed). Here, the search warrant specified that the search was limited to particular items that could provide evidence of the crimes for which probable cause was established. The warrant was not overbroad. *See Morgan*, 562 F. App'x at 128.

Even if such information relating to possession of CSAM was stale, or the affidavit did not support searching electronic devices past 2017, law enforcement's reliance on the search warrant

did not approach the standard of gross negligence required to trigger the exclusionary rule. *See United States v. Franz*, 772 F.3d 134, 147 (3d Cir. 2014). Exclusion applies where a warrant is "so facially deficient that it fail[s] to particularize . . . the things to be seized.'" *United States v. Wright*, 777 F.3d 635, 638 (3d Cir. 2015) (quoting *United States v. Tracey*, 597 F.3d 140, 151 (3d Cir. 2010)). A court must examine not only any defects in the warrant but also the officer's conduct in obtaining a warrant and what the officer knew or should have known. *Id.* The good faith exception applies where "an officer acted illegally but did so 'in the objectively reasonable belief that [his] conduct did not violate the Fourth Amendment." *Caesar*, 2 F.4th at 169.

Here, Agent Zenszer sought the search warrant after months of investigation, including interviews with Minor 1, subpoenas, physical surveillance, and more. The facts provided in her affidavit were specific. As noted in *Caesar*, "in assessing whether [an officer] acted in good faith, we cannot ignore the volume of social science research and legal authority discussing the tendency of child sexual abusers to possess child pornography." 2 F.4th at 176. Thus, even if the information relating to possession of CSAM was stale or there was insufficient probable cause to search Defendant's digital devices beyond 2017, the good faith exception applies.

###    C.    Motion to Dismiss Indictment

Defendant argues that the Indictment must be dismissed due to the following deficiencies: (1) the Assistant U.S. Attorney and Agent Zenszer conducted a readback of Minor 1's prior to grand jury testimony; (2) Agent Zenszer testified that the Defendant's email address was associated with the KIK account, but did not inform the grand jury that the KIK subpoena listed the email address as "(unconfirmed)"; and (3) Counts 1 and 2 of the Indictment charge violations in and around August 2017 but the grand jury did not hear evidence of this time period.

Readbacks are common practice in grand jury proceedings. Further, an indictment can be based on hearsay evidence. *See Costello v. United States*, 350 U.S. 359, 363 (1956). The Third Circuit has used the following three-part test in determining when an indictment based on hearsay is invalid: (1) non-hearsay evidence is readily available, (2) the grand jury is misled into believing it was hearing direct evidence, and (3) there is a high probability that the grand jury would not have indicted had it heard the eye witness. *United States v. Wander*, 601 F.2d 1251, 1260 (3d Cir. 1979). Here, the Government concedes it elected not to call Minor 1 to testify despite her being available to do so. (ECF No. 63 at 20 ("The government is not in the business of revictimizing witnesses simply because the administrative function of a grand jury panel expires before an investigation concludes.").) But there is nothing to suggest that the grand jury was misled into believing it heard direct testimony or that the grand jury would not have indicted had they heard directly from Minor 1. The Assistant U.S. Attorney introduced the readback by stating that it was prior grand jury testimony provided by Minor 1. At the conclusion of the readback, he repeated that the grand jury had just heard a readback of prior grand jury testimony. The distinction between Agent Zenszer and Minor 1 was therefore made clear twice. Further, Agent Zenszer, who read Minor 1's testimony, also testified herself substantially before the grand jury, which decreases the likelihood that the jury confused her with Minor 1 and as such thought they were hearing direct evidence.

Defendant's argument regarding the KIK account fails for a similar reason as it did with his Motion for a *Franks* Hearing. The Government has other evidence tying Defendant to the KIK account separate and apart from the administrative subpoena, namely, information from Minor 1 directly. Grand Jury Exhibit 2 is not the administrative subpoena, as Defendant contends. Rather, it is a friend request log from KIK that has no mention of Defendant's email address, let alone its

"(unconfirmed)" status. (Exhibit B at 57, 94.) It was therefore not a false statement for the Government to tell the grand jury that Defendant was associated with that KIK account. Moreover, the Government is not required to present exculpatory evidence to a grand jury. *United States v. Williams*, 504 U.S. 36, 51–53 (1992). A grand jury hears only evidence on behalf of the prosecution and assesses only whether there is an adequate basis for bringing a criminal charge, and not whether a defendant is guilty or innocent. *Id.* Thus, the Government was under no obligation to present the information from the KIK administrative subpoena to the grand jury.

Lastly, the "in or about August 2017" time period provides an approximate end time. Minor 1 testified that her contact with Defendant decreased after the November 2015 in-person meeting, and that she ceased all communication with him after she left for college. (Exhibit B at 49–50.) "Where 'on or about' language is used, the government is not required to prove the exact dates, if a date reasonably near is established." *Real v. Shannon*, 600 F.3d 302, 308 (3d Cir. 2010) (quoting *United States v. Nersesian*, 824 F.2d 1294, 1323 (2d Cir. 1987)).[5] Because the grand jury was presented with evidence suggesting communication ceased when Minor 1 went to college in August 2017, and Defendant has not shown that a potentially larger timeframe posed as "in or about" would constitute prejudice, the Motion must be denied.

---

[5] Indeed, much case law on this issue addresses the opposite scenario from Defendant's dispute: where evidence at trial points to criminal conduct *outside of* the proposed timeframe. For instance, the Third Circuit found no prejudice where an indictment alleged activity "between on or about January 1, 1970, and July 31, 1970" but where it only proved activity in early 1969. *See United States v. Hill*, 684 F. App'x 140, at n.3 (3d Cir. 2017). The court determined that the defendant showed no evidence that he was surprised by the proof at trial and unable to prepare his defense, and so there was no prejudice in this variance. *Id.* If anything, a potentially enlarged timeframe by a handful of months provides additional notice that the Government may introduce evidence at trial between November 2017 and August 2017.

**IV.    CONCLUSION**

For the foregoing reasons, the Court denies Defendant's Motion for a *Franks v. Delaware* Hearing, Motion to Suppress Evidence, and Motion to Dismiss the Indictment. An appropriate Order follows.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

_____

**HODGE, KELLEY B., J.**